# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| **ANDREW S. FENKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:08-CV-00231** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Andrew Fenker, who is proceeding *pro se*, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB"). (Docket # 1.) The appeal was referred to the undersigned Magistrate Judge on October 16, 2008, by District Judge Theresa Springmann for the issuance of a Report and Recommendation. (Docket # 5.)

Having reviewed the record and pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(d)(1), the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED. This Report and Recommendation is based on the following facts and principles of law.

### I. PROCEDURAL HISTORY

Fenker applied for DIB on January 26, 2005, initially alleging disability as of December

31, 2003, but later amending his onset date to January 25, 2005.[1] (Tr. 66, 484.) The

Commissioner denied Fenker's application initially and upon reconsideration, and Fenker

requested an administrative hearing. (Tr. 25-30, 39, 45.) On August 3, 2007, Administrative

Law Judge ("ALJ") Frederick McGrath conducted a hearing at which Fenker (who was

represented by counsel at the time), his wife, his mother, and a vocational expert testified. (Tr.

481-519.) On December 12, 2007, the ALJ rendered an unfavorable decision to Fenker,

concluding that he was not disabled because despite the limitations caused by his impairments he

could perform a significant number of jobs in the economic region. (Tr. 11-22.) The Appeals

Council denied Fenker's request for review, making the ALJ's decision the final decision of the

Commissioner. (Tr. 3-7.) Fenker filed a complaint with this Court on October 7, 2008, seeking

relief from the Commissioner's final decision. (Docket # 1.)

## II.  FENKER'S ARGUMENTS

Fenker alleges essentially three flaws with the Commissioner's final decision.

Specifically, he claims that the ALJ: (1) erred by concluding at step three that he did not meet

Listing 12.02 or 12.04; (2) improperly evaluated the opinion of his treating family practitioner,

Dr. Kintanar; and (3) improperly evaluated the credibility of his testimony concerning his

debilitating limitations. (Executive Summary ("Opening Br.") 4-14.)

---

[1] Fenker stated at the hearing that he had previously been awarded a closed period of DIB from May 2001 to October 2002, but that he returned to work after October 2002. (Tr. 485.)

# III. FACTUAL BACKGROUND[2]

## *A. Background and Daily Activities*

At the time of the ALJ's decision, Fenker was thirty-six years old, had a bachelor's degree and had completed several graduate courses, and possessed work experience as an addiction counselor, activity director, recreation therapist, and psychiatric technician. (Tr. 66, 121, 149, 489.)  Fenker last worked in January 2005; he alleges that he became disabled due to residual effects of a 1992 brain injury and major depression. (Tr. 115, 485.)

At the hearing, Fenker stated that he stopped working in January 2005 when he was terminated from his job, explaining that "it just wasn't working out between us" and that he "had been alleged to have sexually harassed a client[.]" (Tr. 485.)  He elaborated that he has "impulse control issues" as a result of his prior brain injury, admitting that also he had received an allegation of sexual harassment when he was enrolled in a graduate school at Indiana University Purdue University-Fort Wayne. (Tr. 487-88, 494.)  Fenker, however, could not recall any other specific instance where he made an inappropriate statement, though he admitted that he was fired from most of his prior jobs and that the jobs he did maintain were because the employers were "very accommodating." (498-99.)  He stated that he has worked with vocational rehabilitation in the past. (Tr. 504.)

Fenker testified that he has participated in counseling and takes medication for his impulse control disorder. (Tr. 490-92, 494.)  He identified no side effects from his medication other than weight gain. (Tr. 494.)  He last participated in counseling for his disorder in 2006, which consisted of six to eight sessions, explaining that more recent counseling had been

---

[2] In the interest of brevity, this opinion recounts only the portions of the 519-page administrative record necessary to the decision.

focused on his marital issues. (Tr. 493.)  Fenker stated that he has had suicidal thoughts in the past. (Tr. 512.)

When asked what other residual health problems he experiences from his prior brain injury, Fenker identified memory deficits and concentration difficulties. (Tr. 495.)  He explained that because of his memory deficits he had to take "copious notes" to complete his graduate courses and that his wife leaves written prompts to remind him to take his medication. (Tr. 495, 503.)  When asked why he thought he could not perform simple, one or two-step instruction, repetitive tasks, Fenker responded: "I would lose concentration with it because I would become bored." (Tr. 496.)

Fenker also testified that he has "balance issues", which make his gait uneven, and that he has muscular spasticity on his left side. (Tr. 499, 501.)  He stated that he uses a cane and wears an ankle-foot orthosis daily, though he has not participated in physical therapy since 2002. (Tr. 499-500.)  When asked how much he could lift without difficulty, Fenker stated that he could lift a forty-pound bag of cat litter and pour it into the litter box at home. (Tr. 501.)  He reported that he could sit for thirty minutes at a time. (Tr. 502.)

In describing his typical day, Fenker stated that he independently performs his self care and that he performs household chores from a list that his wife creates. (Tr. 497.)  He articulated that he completes the items on the list "[m]ost days", but that sometimes fatigue and decreased motivation interfere. (Tr. 496-97.)

As to his graduate schooling, Fenker reported that he had completed several graduate level courses but that he "eventually dropped out of that program." (Tr. 489.)  He stated that he dropped out when his wife was hospitalized, explaining that "without her support things fell

apart around [him]." (Tr. 489.)  Though he later returned to school, he ultimately withdrew again, stating that he "couldn't handle the courses and the way they were being taught . . . ." (Tr. 490.)

Fenker's wife also testified at the hearing and essentially corroborated Fenker's testimony. (Tr. 506-11.)  More specifically, she stated that she witnesses inappropriate statements by her husband from time to time, the most recent being two to three months earlier, and that he often does not recognize that his statements are inappropriate. (Tr. 506-07.)  She also reported that Fenker is "fatigued generally every day", that he has trouble sleeping at night, that he "has a very flat affect", and that he feels "very generally down". (Tr. 507-08.)

### B.  Summary of the Medical Evidence

Fenker suffered a closed head injury in 1992 as a result of a car accident. (Tr. 274.)

In November 1999, Teresa Strout, Ph.D., a clinical neuropsychologist, evaluated Fenker and found that his simple visual, auditory, and tactile sensory perception was intact. (Tr. 274-79.)  She further found that Fenker had normal to moderate limits in specific sensory functions, and that damage in these areas had been associated with disinhibition. (Tr. 277.)  She also found impaired motor performance and slowed fine motor manipulation. (Tr. 278.)  Fenker's verbal expression was characterized by an above average vocabulary with good articulation; Dr. Strout noted no evidence of antisocial or psychotic behavior. (Tr. 275, 277.)  Testing results indicated that Fenker's memory was within the average range and that he was functioning in the high average range of intelligence. (Tr. 276, 278.)  She thought he may benefit from counseling for depression. (Tr. 279.)

In July 2001, Ronald Williams, Ph.D., a neuropsychologist, examined Fenker, noting that

he wanted to apply for DIB so that he could get insurance because he had too much money to qualify for Medicaid. (Tr. 272.) He also documented that Fenker wanted to go to graduate school but did not want to spend the money he had saved to do so. (Tr. 272.) Dr. Williams opined that Fenker lacked motivation and energy, and that is "very classically depressed", which he thought hindered him from pursuing employment. (Tr. 272. ) Dr. Williams stated that his "opinion is firmly that [Fenker] needs to be working" and that he "absolutely could not with any clear conscience be a part of supporting [Fenker's] application for disability." (Tr. 273.)

On July 27, 2001, Fenker was seen by Dr. Sheryl Fergusson, a family practitioner, reporting that he had lost his job in May 2001 and wanted to go to school in Bloomington but needed DIB to do so. (Tr. 223; *see also* Tr. 272.) Fenker complained of significant depression and constant fatigue, and Dr. Fergusson observed that Fenker's extremities had spasticity with minimal movement. (Tr. 223.) She assigned the following diagnoses: chronic depression with insomnia, closed head injury 1992, hyperspasticity disorder, impaired motor function, impaired memory function, and poor mental flexibility secondary to head injury in 1992 with hypertonic left sided hemiplegia. (Tr. 223.) Dr. Fergusson referred Fenker for evaluation by a physical therapist, neurologist, psychiatrist, and psychologist. (Tr. 223.)

In September 2002, Dr. Herbert Trier, a psychiatrist, together with Scott Salon, Ph.D., evaluated Fenker, noting symptoms of depression, sleep disturbance, feelings of hopelessness and frustration, crying episodes, difficulty concentrating, and diminished interest and concentration. (Tr. 246-47, 343-47.) Dr. Trier assigned him a Global Assessment of Functioning

(GAF) score of 60, indicating moderate symptoms.[3] (Tr. 345.)  Fenker participated in twelve

psychotherapy sessions with Dr. Salon between October 2002 and July 2003, and continued to

see Dr. Trier for medication management. (Tr. 246, 308-40.)

On May 20, 2003, Fenker was evaluated by Dr. Kintanar, his family practitioner, for pain

in his right hip and knee, and spasticity that had recently worsened. (Tr. 221.)  Fenker returned

on August 1, 2003, and saw Dr. Kintanar's nurse practitioner, who observed that he favored his

left side but had no spasticity on that day and that he wore his leg brace but did not use a cane.

(Tr. 215.)  In November 2003, Fenker reported to Dr. Kintanar that his left leg spasticity kept

him awake at night if he did not take Baclofen; therefore, Dr. Kintanar increased Fenker's

dosage. (Tr. 213.)  In March 2004, Fenker complained of spasticity during the day, and thus Dr.

Kintanar again increased Fenker's dosage of Baclofen, so that he could use it during the day as

well as at night. (Tr. 211.)  Dr. Kintanar noted that Fenker walked with a cane and an ankle-foot

orthosis. (Tr. 211.)

In February 2005, Dr. Trier assigned Fenker a diagnosis of depressive disorder not

otherwise specified and a current GAF score of 56, noting that his highest GAF score over the

past year was 59, indicating moderate symptoms. (Tr. 289-95.)  Dr. Trier stated that Fenker's

prognosis was guarded. (Tr. 294.)

In March 2005, Dr. Michael Holton examined Fenker at the request of the state agency.

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American
Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).
  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep
a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech,
occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends,
conflicts with peers or co-workers). *Id.*

(Tr. 380-82.)  Fenker told Dr. Holton that he could sit for one and one-half hours, stand for thirty-five minutes, and walk three-fourths of a mile or up two flights of stairs without significant difficulty. (Tr. 380.)  Dr. Holton noted that Fenker had an antalgic gait favoring his left leg and that he used a cane for balance. (Tr. 381.)  Upon examination, Fenker exhibited normal strength in his right extremities and good strength in his left extremities, though he had atrophy of his left calf muscle and forearm. (Tr. 381-82.)  His light touch, grip strength, and control of movement were diminished on his left side, and his reflexes were increased on the left but normal on his right. (Tr. 382.)  Fenker also had some decreased range of motion, but his straight leg raising test was negative bilaterally. (Tr. 382-83.)

In April 2005, Dr. L. Bastnagel, a state agency physician, reviewed Fenker's records and concluded that he could frequently lift ten pounds and occasionally lift twenty pounds; stand or walk for two hours; sit for six hours; perform unlimited pushing and pulling; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 358-65.)

That same month, Barbara Gelder, Ph.D., examined Fenker at the request of the state agency. (Tr. 384-88.)  Dr. Gelder administered memory testing and noted that she expected better memory scores due to his educational history; thus, she thought it likely that Fenker had sustained some residual impairment from his brain injury, though she could not render a definitive determination. (Tr. 388.)  She diagnosed Fenker with dysthymia and assigned him a current GAF score of 53 and a past GAF score of 55, indicating moderate symptoms. (Tr. 388.)

Later in April 2005, B. Horton, Psy.D., a state agency psychologist, reviewed Fenker's records and opined that he had mild functional limitations. (Tr. 366-79.)  Dr. Horton noted that neither Fenker's testing scores nor his daily living activities (which included playing computer

games, helping with chores around the house, and shopping for groceries) suggested that he had a severe impairment. (Tr. 378.)

On July 28, 2005, Dr. Trier penned a letter stating that Fenker's treatment plan was medication management and that his prognosis was stable. (Tr. 246-47.) Dr. Trier noted that Fenker reported increased depression from losing his job in January 2005; he further observed that Fenker's mood was depressed but that he was oriented, had a neatly groomed appearance, calm affect, and no suicidal ideation. (Tr. 246-47.) Fenker reported improved sleep and no adverse side effects from medication. (Tr. 247.) From August 2005 through July 2006, Fenker continued to see Dr. Trier for monthly medical management sessions. (Tr. 225-41.)

Dr. Kintanar's treatment notes from January 2005 through August 2006 indicate that he continued to treat Fenker with Baclofen for his left-sided spasticity; he also prescribed Fenker a left hand splint to better control his spasticity. (Tr. 186, 192, 198-99, 249.) In June 2005, Dr. Kintanar stated that stress caused Fenker's' spasticity to increase and his attention and balance to decrease. (Tr. 198.) He further opined that Fenker compensated well for his issues but that the cumulative effects of his injuries rendered him unable "to maintain uninterrupted employment in his chosen career field". (Tr. 199.)

Dr. Trier's treatment notes from September 2006 to June 2007 reflect that Fenker was worried and depressed at times, but that he had no suicidal ideation and usually slept well. (Tr. 166-73.)

In May 2007, Dr. Kintanar opined that Fenker's spasticity had a moderate effect on his daily living activities, but that it would not likely disrupt co-workers or require additional supervision of Fenker at work. (Tr. 176.) He stated that Fenker could walk for four blocks, sit

for thirty minutes at a time, and stand for two and one-half hours at a time for a total of either four hours or at least six hours per day.[4] (Tr. 177.)  He also opined that Fenker needed to take a fifteen-minute walk every thirty minutes but did not need a job that allowed shifting of positions at will; that he needed to take unscheduled breaks during the day; and that he should avoid concentrated exposure to all environmental hazards. (Tr. 178, 180.)  He stated that Fenker should elevate his legs with prolonged sitting and that he needed a cane or other assistive device for his leg, though he stated he did not need an assistive device for his arm. (Tr. 178.)

Dr. Kintanar further opined that Fenker should rarely twist, stoop, or squat, and that tremors, fatigue, and side effects of medication limit Fenker's use of his arms. (Tr. 178-79.)  Yet, elsewhere in his opinion, Dr. Kintanar indicated that weight gain was the only side effect of Fenker's medication. (Tr. 177.)  He also reported that Fenker's symptoms were occasionally severe enough to interfere with his attention and concentration and that Fenker was incapable of performing even low stress jobs; yet, he identified no psychological limitations. (Tr. 177, 179.)  He further expressed that Fenker would have good days and bad days and that he would likely be absent from work more than four days per month. (Tr. 179.)

In September 2007, Dr. Trier opined that in some circumstances, Fenker was seriously limited in several mental abilities and aptitudes necessary to do work, including the ability to deal with stress and social interactions in the work environment and to carry out detailed instructions, but that these limits did not totally preclude his functioning. (Tr. 154-55.)  He assigned Fenker a current GAF score of 50, indicating serious symptoms, and a highest GAF

---

[4] It is unclear whether Dr. Kintanar checked the "about 4 hours" box or the "at least 6 hours" box. (Tr. 177.)

score in the past year of 60, indicating moderate symptoms. (Tr. 152.)  Yet, Dr. Trier thought

that Fenker's impairments or treatment would cause him to miss work only one day a month.

(Tr. 156.)

## IV.  ANALYSIS

### A.  The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to . . . last for a continuous period of not less than 12

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A).  A physical or mental impairment is "an

impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C.

§ 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process,

requiring consideration of the following issues, in sequence: (1) whether the claimant is currently

unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. §

404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5)

whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. §

404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  An affirmative answer

leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.

_____

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

*Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

### B. The ALJ's Decision

On December 12, 2007, the ALJ rendered his opinion. (Tr. 11-22.) He found at step one of the five-step analysis that Fenker had not engaged in substantial gainful activity since his amended onset date, and at step two, that Fenker had the following severe impairments: traumatic brain injury, depression, and left-sided hemiplegia. (Tr. 13.) At step three, he determined that Fenker's impairments were not severe enough to meet a listing, in particular, Listings 11.18, 12.02, 12.04. (Tr. 13-16.) Before proceeding to step four, the ALJ determined that Fenker's testimony concerning the intensity, persistence, and limiting effects of his symptoms was "not entirely credible" (Tr. 17) and assigned him the following RFC:

> [T]he claimant has the residual functional capacity to perform light work except that he is limited to unskilled, one[] or two-step tasks, with no interaction with the public. He can be around employees throughout the workday but work would be essentially isolated, with only occasional (up to 1/3 of the work day) conversations and interpersonal interactions of a brief duration (5 to 10 minutes) related to his job duties.

(Tr. 16.)

Based on this RFC, the ALJ concluded at step four that Fenker could not perform any of his past relevant work. (Tr. 20.) The ALJ then proceeded to step five where he determined that, considering his age, education, and experience, and in reliance on the testimony of the vocational expert, Fenker could perform a significant number of light-work jobs within the economic

region, including folder, janitor, and packager.[6] (Tr. 21.)  Therefore, Fenker's claim for DIB was

denied. (Tr. 21-22.)

### C.  Substantial Evidence Supports the ALJ's Conclusion at Step Three That Fenker Did Not Meet Listing 12.02 or 12.04

Fenker argues that the ALJ erred at step three when he concluded that Fenker's

impairments did not meet or equal Listing 12.02, Organic Mental Disorders, or 12.04, Affective

Disorders. (Opening Br. 5-9.)  Fenker's argument is unavailing.

The listings describe impairments that are considered presumptively disabling when

specific criteria are met. *See* 20 C.F.R. § 404.1525(a).  To meet or equal a listed impairment, a

claimant must satisfy all of the criteria set forth in the listing. *See Maggard v. Apfel*, 167 F.3d

376, 380 (7th Cir. 1999).  The burden of proving that his condition meets or equals a listed

impairment rests with the claimant. *Id.*; *see also Shinaberger v. Barnhart*, No. 1:05-cv-0276-

DFH-TAB, 2006 WL 3206338, at *11 (S.D. Ind. Mar. 31, 2006) ("In demonstrating medical

equivalence, the claimant has the burden of presenting 'medical findings equal in severity to *all*

the criteria for the one most similar listed impairment.'" (quoting *Sims v. Barnhart*, 309 F.3d

424, 428 (7th Cir. 2002))).  Yet, the Seventh Circuit Court of Appeals has stated that although

the burden of proof rests with the claimant, an ALJ "should mention the specific listing he is

considering and his failure to do so, if combined with a 'perfunctory analysis,' may require a

remand." *Ribaudo v. Barnhart*, 458 F.3d 580, 583-84 (7th Cir. 2006) (citing *Barnett v. Barnhart*,

381 F.3d 664, 670 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th

Cir. 2003)); *see also Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

---

[6] The ALJ further concluded that though he did not limit Fenker to sedentary work, Fenker could also perform the following sedentary jobs: bench worker, waxer, and brake line coater. (Tr. 21.)

Here, the ALJ penned two and one-half pages on his step three decision, specifically identifying Listings 12.02 and 12.04 and articulating in detail why Fenker did not meet or satisfy either Listing.[7] (Tr. 13-16.)  The ALJ first explained that under the "paragraph B" criteria of either Listing, a claimant must show that his mental impairments result in at least two of the following: marked restriction in activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. (Tr. 13); *see* 20 C.F.R. § 404, Subpt. P, App. 1, §§ 12.00C (stating that a "marked" limitation means "more than moderate but less than extreme"), 12.02B, 12.04B.

The ALJ then thoroughly discussed the "paragraph B" Listing criteria with respect to Fenker (spending a paragraph on each requirement) and cited specific evidence from each category.  He recited, among other things, that Fenker is independent in his self care and is able to shop, play computer games, and perform household chores. (Tr. 14-15.)  He further noted that Fenker socializes with his family, interacts on-line and outside the home, and was cooperative with examiners. (Tr. 14-15.)  In addition, he observed that Fenker's test scores indicated average intelligence and memory, and that his GAF scores generally indicated moderate mental health symptoms.[8] (Tr. 14-15.)  Based on this evidence, the ALJ reasonably concluded that Fenker had

_____

[7] The ALJ also discussed Listing 11.18, Cerebral Trauma, in detail (Tr. 15-16), but Fenker does not challenge that portion of the ALJ's step three decision.

[8] Fenker argues that the ALJ should have cited his 2005 WAIS-III scores, rather than his 1999 scores, when considering whether he met a listing.  However, the ALJ *did* cite his 2005 intelligence testing scores (Tr. 14, 19), in addition to his 1999 scores (Tr. 18-19), and thus, Fenker's argument is misplaced.  Furthermore, Dr. Horton, the state agency psychologist who reviewed Fenker's 2005 testing scores, specifically stated that the scores were inconsistent with a severe impairment (Tr. 378), and Dr. Gelder, who administered the 2005 intelligence testing, assigned him a GAF score representing only a moderate impairment (Tr. 388).

And, Fenker's assertion that he is at risk for "boredom" due to his higher level of intelligence if he were to perform the jobs of folder, janitor, or packager as prescribed by the ALJ, suggesting that his boredom may lead to

14

only a mild restriction in activities of daily living; moderate difficulty with maintaining social functioning and sustaining concentration, persistence, or pace; and no episodes of decompensation of extended duration, and therefore failed to satisfy the "paragraph B" criteria of either Listing. (Tr. 14-15.)

The ALJ also emphasized that Fenker could not satisfy the "paragraph C" criteria of Listing 12.02 or 12.04. (Tr. 15); *see* 20 C.F.R. § 404, Subpt. P, App. 1, §§ 12.02C, 12.04C.  He reiterated that Fenker has had no repeated episodes of decompensation and that he does not require a highly supportive living arrangement. (Tr. 15.)   He also opined that Fenker's adjustment to his impairments is not so marginal that even slight increases in mental demands would be expected to cause him to decompensate. (Tr. 15.)

Moreover, in reaching his decision, the ALJ relied upon the assessment of the state agency physicians, who concluded that Fenker's impairments did not meet or equal a listing.  To explain, the state agency physicians completed Disability Determination and Transmittal forms at the initial and reconsideration levels and concluded that Fenker was not disabled. (Tr. 42, 43, 376.)  The Seventh Circuit Court of Appeals has articulated that "[t]hese forms conclusively establish that consideration by a physician . . . designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (internal quotation marks and citations omitted).  Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts." *Id.* (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p.

---

failure in the workplace, is simply not a basis upon which to award DIB. (Tr. 9.)  Indeed, if the risk of boredom were a basis upon which to award DIB, the majority of the workforce of this country might well qualify for DIB.

Thus, the ALJ's step three finding that Fenker's impairments failed to meet any listing is supported by substantial evidence.

### D. Substantial Evidence Also Supports the ALJ's Evaluation of Dr. Kintanar's Opinion

Fenker next argues that the ALJ erred by failing to properly evaluate the opinion of Dr. Kintanar, his treating family practitioner. This assertion by Fenker also fails to provide a basis for a remand.

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2). However, this principle is not absolute, as a "treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. §§ 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because his treating physician states that he is "unable to work" or "disabled," *Clifford*, 227 F.3d at 870; the determination of disability is reserved to the Commissioner. *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also* 20 C.F.R. § 404.1527(e)(1). Regardless of the outcome, the Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2).

Here, the ALJ expressly considered Dr. Kintanar's opinion, particularly his statement that

Fenker's combination of impairments is disabling and his statements pertaining to the side effects Fenker experiences from his medication. (Tr. 19-20.)  In fact, he penned an entire paragraph about Dr. Kintanar's opinion, articulating in detail why he ultimately assigned it limited weight. (Tr. 19-20.)  The ALJ reasonably inferred that Dr. Kintanar's opinion was based primarily upon Fenker's subjective allegations, which the ALJ determined were less than fully credible. (Tr. 19); *see White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) (discounting a treating physician's opinion because it was based on claimant's "subjective complaints rather than accepted medical techniques"); *Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him); *see generally Scheck*, 357 F.3d at 702 ("[I]t is not unheard of that a personal physician might have been leaning over backwards to support the application for disability benefits." (citation and quotation marks omitted)); *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

And, the ALJ also correctly observed that Dr. Kintanar's opinion was internally inconsistent, and inconsistent with certain other substantial evidence of record, creating additional bases upon which to discount the opinion.  For example, the ALJ noted that Dr. Kintanar stated at one point in his May 1, 2007, documentation that the only medication side effect that Fenker experiences is weight gain, but then said in another portion of his report that Fenker's use of his arms was affected by medication side effects. (Tr. 20; *compare* Tr. 177, *with* Tr. 179); *see Smith v. Apfel*, 231 F.3d 433, 441 (7th Cir. 2000) (discounting a treating physician's opinion because, among other things, it was internally inconsistent).  And, the ALJ found

Fenker's work history, consisting of many years of work at the light level of exertion, was inconsistent with Dr. Kintanar's assertion of total disability, a determination which, in any event, is reserved to the Commissioner. *Smith*, 231 F.3d at 441 (discounting a treating physician's opinion because, among other things, it was inconsistent with other substantial evidence of record); *see generally Brummet v. Barnhart*, No. 1:05-cv-00581-DFH-VSS, 2006 WL 3248452, at *12 (S.D. Ind. June 13, 2006) ("An ALJ may discount a treating source's opinion as long as the ALJ provides a reasoned explanation for that decision." (citing *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004))).

Furthermore, to the extent that the record contains conflicting evidence concerning the severity of Fenker's impairments, it is the ALJ's role to weigh the conflicting medical evidence and resolve the conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971) ("We . . . are presented with the not uncommon situation of conflicting medical evidence. The trier of fact has the duty to resolve that conflict."). Here the ALJ did just that, marching through various medical opinions of record to resolve the conflicts. Though Fenker may disagree with the ALJ's ultimate weighing of the evidence, such disagreement does not provide a basis for overturning the ALJ's decision. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("[The Court may not] reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner.").

In sum, the ALJ's assessment of Dr. Kintanar's opinion is supported by substantial evidence and does not warrant a remand of the case.

### E. The ALJ's Credibility Determination Should Not Be Disturbed

Fenker also contends that the ALJ erred by finding that his testimony of debilitating

limitations "not entirely credible." (Tr. 17.)  Fenker's final challenge to the ALJ's decision is unsuccessful as well.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo*, 458 F.3d at 584, his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ cited several reasons for concluding that Fenker's testimony of debilitating limitations was not entirely credible, including several inconsistent remarks made by Fenker, a lack of objective medical evidence, and Fenker's conservative treatment regime.  For example, the ALJ noted that Fenker's allegations of great fatigue as a result of hypothyroidism were not supported by the results of his thyroid function tests, which were performed regularly and generally showed results in the normal range. (Tr. 17-18); *see* 20 C.F.R. § 404.1529(c)(2); *Smith*, 231 F.3d at 439 ("[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility."); SSR 96-7p.  And, the ALJ observed that Fenker's suggestion that his fatigue was a side effect of his medication was contradicted by the medical evidence, as Fenker denied experiencing side effects to Dr. Trier. (Tr. 18.)

19

The ALJ further observed that Fenker testified that his medical condition prevented him from being successful in graduate school, but that Fenker told Dr. Trier that he dropped out of school because he felt the program was not going anywhere. (Tr. 14, 18; *compare* Tr. 489-90, *with* Tr. 169); *see* 20 C.F.R. § 404.1529(c)(3); *Hill v. Astrue,* No. 1:08-cv-0740-DFH-JMS, 2009 WL 426048, at *10 (S.D. Ind. Feb. 20, 2009) (discounting a claimant's credibility where discrepancies were noted between her testimony and her statements to her physicians); *Stubbs v. Apfel*, No. 97 C 7069, 1998 WL 547107, at *8 (N.D. Ill. Aug. 20, 1998) (same); SSR 96-7p ("One strong indication of the credibility of an individual's statements is their consistency . . . . The adjudicator must consider such factors as . . . [t]he consistency of the individuals' own statements.").

The ALJ also considered that Fenker's average intelligence and memory test scores, and his conservative treatment regime, which had not changed in many years, belied Fenker's assertion that his mental deficits are severe enough to prevent all competitive employment.[9] (Tr. 18-19); *see* 20 C.F.R. § 404.1529(c)(3); *Ross v. Astrue*, No. 08-C-450, 2009 WL 742761, at *3 (E.D. Wis. Mar. 17, 2009) (discounting claimant's credibility where she received "conservative, minimal and routine treatment"); *Christianson v. Astrue*, No. 3:07-cv-00485-bbc, 2008 WL 3559623, at *7 (W.D. Wis. Feb. 6, 2008) (same); *Vincent v. Astrue*, No. 1:07-cv-28, 2008 WL 596040, at *16 (N.D. Ind. 2008) (same); SSR 96-7p.

---

[9] Fenker asserts that the ALJ erred when analyzing his credibility by failing to consider the fact that in addition to medication management, he also received psychological counseling while pursuing his graduate studies. Yet, the ALJ expressly acknowledged this fact earlier in his decision (Tr. 17), and thus Fenker's assertion does not serve as a basis to disturb the ALJ's credibility determination. *See generally Berger v. Astrue*, 516 F.3d 539, 545-46 (7th Cir. 2008) (affirming the ALJ's credibility determination because it was not "patently wrong" or "divorced from the facts contained in the record", even though some of the ALJ's findings were a "bit harsh"); *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

In sum, the ALJ adequately built an accurate and logical bridge between the evidence of record and his conclusion that Fenker's testimony was not entirely credible, and his determination is not "patently wrong." *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, should not be disturbed.

## V. CONCLUSION

For the foregoing reasons, the undersigned Magistrate Judge recommends that the Commissioner's decision be AFFIRMED.

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* Plaintiff and to counsel for the Defendant. NOTICE IS HEREBY GIVEN that within ten days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings and/or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.

SO ORDERED.

Enter for this 1st day of July, 2009.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge